NINE HUNDRED AND TEN BALES OF COTTON (UNITED STATES v.). See Case No. 15,882.

---

## Case No. 10,272.

NINE HUNDRED AND TWENTY-EIGHT BARRELS OF SALT.

[2 Biss. 319;[1] 2 Chi. Leg. News, 317.]

District Court, N. D. Illinois. June, 1870.

GENERAL AVERAGE—DUTY OF CARRIER AS TO VESSEL.

1. A common carrier by water is bound to provide a safe and sea-worthy ship, in all respects fitted to carry her cargo through the ordinary perils of navigation, and the failure of so essential a portion of the mechanism as the rudder, in a gale of no extraordinary violence, is

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

sufficient evidence that the vessel was unseaworthy in this regard.

2. The injury to the rudder being fairly chargeable to the common perils of the sea. the carrier is not protected by the exceptions in his bill of lading, and cannot charge the consequences against the cargo.

3. Having reached a harbor of safety, and it being practicable for him to gain a neighboring harbor of repair, the expense of towing the ship to her destination, incurred by the master, cannot be charged pro rata against the cargo.

4. To compel the cargo to contribute to the towage, it must be shown that this was the only reasonable alternative left to the master, and the soundness of his judgment may be questioned by the owners of the cargo.

In admiralty. Libel [by Lyon] for general average by the owner of the schooner Emu.

Rae & Mitchell, for libellant.
Waite & Clarke, for respondent.

BLODGETT, District Judge. This is a libel upon substantially the following facts, as set up in the libel and shown by the proofs. The schooner Emu, on or about the 10th of September, 1866, took on board at the port of Oswego 2,330 barrels of salt, for the Salt Company of Onondaga, to be carried to the port of Chicago at a freight charge of forty-two cents per barrel. On or about the 20th of said month said schooner encountered a heavy gale of wind while on Lake Huron, and when about thirty miles from Mackinaw her officers found that her rudder-post was split so that she could not be steered by her rudder, but by taking down the mainsail they were enabled to run into the port of Mackinaw in four hours. Here the captain sent his mate on shore to ascertain whether repairs could be made at that place so as to enable them to proceed on their voyage, and on being told that there were no ship carpenters at that place, he engaged the steam tug Leviathan to tow the schooner, with her said cargo on board, to her port of destination, and on her arrival here the libellants made this claim of general average against the schooner, cargo and freight, for the expense of said towage. The whole bill amounting to $1,715, being at the rate of $300 per day for five and one-half days for the tug; $50 for use of hawser, and $15 for the expenses of making the average.

The evidence shows that very little time was taken by the officers of the schooner to make inquiries as to whether the necessary repairs could be made at Mackinaw; that there were workmen at that point of sufficient skill either to put in a new rudder-post, or to have banded or repaired the old one, and that more thorough inquiry would have disclosed this fact. It is also shown by the proof that the port of Sheboygan, or Duncan harbor, seventeen miles from Mackinaw, was an entirely safe harbor, with mechanics who could have made said repairs, and plenty of available material for the purpose of such repairs; also that there were ample and safe docks and warehouses, where said cargo could have been unloaded

and stored until another vessel could have been obtained.

It is contended on the part of the libellants that Mackinaw was not a port of repair, nor a safe port of refuge in all winds, and that the captain being the agent of the ship and cargo, his action in the premises is binding upon all, and cannot be questioned, except for fraud.

The respondents resist the claim and insist: First, that the injury sustained by the schooner was not caused by the unavoidable perils of the sea, but was occasioned by the unseaworthy condition of the vessel. Second, the cargo had ceased to be at risk and in danger at the time the expense for towing was incurred, the vessel having made a safe port where the cargo could have been unloaded and safely stored until sent forward by another vessel. Third, that the rudder could have been repaired at Mackinaw with very little delay, and the vessel would have been safe in the harbor of Mackinaw while awaiting such repairs. Fourth, that even if they could not have made the repairs at Mackinaw, they could have found every reasonable facility for doing so at Sheboygan or Duncan harbor, only seventeen miles distant from the port of Mackinaw.

As to the question of fact involved in the first point, the evidence does not show that the gale was so violent as to have necessarily or probably broken or disabled the rudder-post of the vessel, if it had been sound and in good condition. The captain, in his deposition, says it was "blowing hard," when they found she did not answer her helm, and an examination disclosed the fact that the rudder-post was split. They took down the mainsail and worked into Mackinaw, then thirty miles distant, in four hours. This shows conclusively to my mind that the vessel did not become disabled by an unavoidable peril of the sea, but that, on the contrary, her rudder-post gave out from sheer insufficiency to withstand the ordinary vicissitudes of such a voyage as the vessel was then engaged upon.

A common carrier by water is bound by law to provide a safe and sea-worthy ship, in all respects fitted to carry her cargo in safety through the ordinary perils of navigation, and the failure of so essential a portion of the mechanism by which the vessel was navigated as occurred in this case, in a gale of no extraordinary violence, is sufficient evidence to my mind that the vessel was unseaworthy in this regard. If, then, this injury to the rudder is fairly chargeable to the ordinary perils of the sea, and not to those of an extraordinary nature, the carrier will not be protected by the exception in his bill of lading, but must bear the damages consequent upon the accident himself. His first duty is to provide a safe, stanch and sea-worthy vessel, and if he has not done so the consequences of that failure cannot be charged against the cargo, because it was the negligence of the carrier, and not an overruling Providence.

that placed the cargo in peril. The burden, then, is upon the carrier to show that the disabling of the vessel was not the result of his own negligence, before he can call upon the cargo for contribution; and I am clearly of opinion that the proof in this case fails to make out any such state of facts on the part of the libellants.

But even if this point is not well taken, the proof shows that the vessel, with her cargo on board, arrived safely in the harbor of Mackinaw, and although there is some conflict of evidence as to whether she could have been repaired there, no doubt is left by the evidence that she could have been repaired at Sheboygan or Duncan harbor, only seventeen miles distant, to which place she could have been worked by her sails, as she had already been thirty miles, or she might have been towed there by the tug she employed to tow her to Chicago. Instead of doing this, and apparently without making any inquiry or discussing the feasibility of any other expedient than that which he adopted, the master of the vessel resorted to the extraordinary measure of employing a tug at $300 per day to tow his vessel the remainder of his uncompleted voyage, about two-thirds having been accomplished.

It is true that, in a certain qualified sense, the master of the vessel is the agent of both ship and cargo, but it is a novel doctrine to assert that he is an agent whose conduct can in no case be questioned, and from whose decision there is no appeal. Primarily, his allegiance is to the ship, and his agency confined to such acts of discretion as are devolved upon him by the owners of his vessel, and it would be a truly dangerous doctrine to hold that the owners of the cargo could not question the soundness of his judgment in a matter where they were interested against the carrier.

Here suitable or even casual inquiry among the residents of Mackinaw, would have disclosed the fact that he could repair his vessel at Sheboygan harbor. But he made no inquiries, nor is there any evidence that he caused any to be made. He did not even go on shore himself. He only sent his mate ashore, who made some inquiries, very slight, and occupying only a few minutes of time, and being told there were no ship carpenters there, he at once engaged the tug to tow the vessel to Chicago, the captain ratifying this action of the mate. Here is an expense for towage of upwards of $1,700, which might by due inquiry and exertion have been avoided by the master of the vessel, and this court is asked to enforce a pro rata of this, amounting to nearly $500, against the cargo. It seems to me the conduct of the master is indefensible in this regard. He seems to have made, practically, no effort to repair his vessel, but engaged the tug without considering any other means by which the damage could have been repaired, and his vessel forwarded on her voyage in the usual way. The circumstances in which he was placed then did not, in my view of the case, justify the extraordinary expenditure incurred. The vessel could have been repaired either at Mackinaw or at Sheboygan harbor, and the master had no right to resort to the expensive alternative of employing a tug at the expense of the cargo, to complete the voyage.

The evidence fails to show that the incurring of this large bill for towage was the only reasonable alternative open to the master of the vessel, and this the libellants must do before they can sustain this case. At the time the tug was chartered neither the vessel nor cargo were in peril. They had made a safe harbor of refuge, at least, and reasonable time should have been taken to fully canvass the situation, and decide upon the best course to pursue after full consideration and inquiry. It is not one of those mistakes of judgment made under stress of imminent peril, but the towing seems to have been resorted to more for the purpose of saving time to the vessel than for that of saving a jeopardized ship and cargo. The repairs were not of so intricate or radical a nature as to require the ship to go into dry dock, nor the services of highly skilled workmen. Most experienced seamen know enough of carpentering and the use of tools to have repaired this rudder-post, and the chief peril of the ship seems to have been that of loss of time by the delay requisite to make the needed repairs, whereby another trip that season might be lost, rather than any such immediate danger to ship and cargo as justifies the sacrifice of part for the benefit of all.

Claim for freight allowed; contribution disallowed.

NOTE. A carrier is bound to provide a vessel tight and stanch and properly furnished for her voyage. Abb. Shipp. (5th Am. Ed.) 417-419; Lyon v. Mells, 5 East, 428; Putnam v. Wood, 3 Mass. 481; Kimball v. Tucker, 10 Mass. 192; Goodridge v. Lord, Id. 483; Bell v. Reed, 4 Bin. 127; Clark v. Richards, 1 Conn. 54. Every freight contract by a carrier by river implies that his boat is river worthy at the time, and it is incumbent on him to show that his boat is capable of performing it. McClintock v. Lary, 23 Ark. 215. For a full discussion of the law of general average and contribution, see 1 Pars. Shipp. & Adm. p. 338, and sequitur. In Backhouse v. Sneed, 1 Murphy (N. C.) 173, the rudder was broken by the force of the sea, and the cargo, in consequence, lost. The rudder had the appearance of soundness, but proved to be internally rotten, though its rottenness was unknown to the owner. *Held*, the carrier liable. Where the master in good faith incurs great expense in securing the safety of both ship and cargo, the cargo is liable to contribution, without reference to the question whether the expense might have been lessened had the cargo been separated from the vessel. Goodwillie v. McCarthy, 45 Ill. 187. The master has no power to bind the vessel for a contract to tow a disabled vessel from one port to another. Kimball v. The Dispatch [Case No. 7,773].

NINE HUNDRED BASKETS OF CHAMPAGNE (UNITED STATES v.). See Case No. 15,883.